19

1　PAUL J. PASCUZZI, State Bar No. 148810
　JASON E. RIOS, State Bar No. 190086
2　THOMAS R. PHINNEY, State Bar No. 159435
　FELDERSTEIN FITZGERALD
3　WILLOUGHBY PASCUZZI & RIOS LLP
　500 Capitol Mall, Suite 2250
4　Sacramento, CA 95814
　Telephone:　(916) 329-7400
5　Facsimile:　(916) 329-7435
　Email:　　ppascuzzi@ffwplaw.com
6　　　　　　jrios@ffwplaw.com
　　　　　　tphinney@ffwplaw.com
7
　ORI KATZ, State Bar No. 209561
8　ALAN H. MARTIN, State Bar No. 132301
　SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
9　　A Limited Liability Partnership
　　Including Professional Corporations
10　Four Embarcadero Center, 17th Floor
　San Francisco, California 94111-4109
11　Telephone:　(415) 434-9100
　Facsimile:　(415) 434-3947
12　Email:　　okatz@sheppardmullin.com
　　　　　　amartin@sheppardmullin.com
13
　Proposed Attorneys for
14　The Roman Catholic Bishop of Sacramento

15　　　　　　UNITED STATES BANKRUPTCY COURT
　　　　　　　EASTERN DISTRICT OF CALIFORNIA
16　　　　　　　　SACRAMENTO DIVISION

17　In re:　　　　　　　　　　│　Case No. 24-21326

18　THE ROMAN CATHOLIC BISHOP OF　│　Chapter 11
　SACRAMENTO,
19　　　　　　　　　　　　　│　DCN: FWP-1

20　　　　　Debtor in Possession.　│　Date:　　　April 4, 2024
　　　　　　　　　　　　　│　Time:　　　10:00 a.m.
21　　　　　　　　　　　　　│　Location:　Courtroom 35 (Dept. C)
　　　　　　　　　　　　　│　Judge:　　Hon. Christopher M. Klein
22
　　　　　　　　　　　　　│　Order Shortening Time
23

24

25　　　**DECLARATION OF THOMAS MCNAMARA IN SUPPORT OF CHAPTER 11**
　　　　　　　**PETITION AND FIRST DAY MOTIONS**
26

27

28

I, Thomas McNamara, hereby declare under penalty of perjury as follows:

1.　　I am the Chief Financial Officer ("CFO") of The Roman Catholic Bishop of Sacramento, the debtor in possession herein ("RCBS" or the "Debtor in Possession"). I have been the CFO since 1993. I have been affiliated with the Diocese as a parishioner for over 64 years. I hold an inactive Certified Public Accountant license which I obtained in 1986. I have a Bachelor of Science in Accounting from the University of San Diego. I am a member of the American Institute of Certified Public Accountants and the California Society of Certified Public Accountants. I am authorized to provide this declaration setting forth the general structure and history of RCBS. In the course and scope of my duties as CFO, I am familiar with the record keeping practices and policies of the RCBS and how it regularly maintains its business records.

2.　　All facts set forth in this Declaration are based on my personal knowledge, upon information supplied to me by employees and others who report to me, upon information supplied to me by the RCBS's professionals and consultants, upon my review of relevant documents, or upon my opinion based on my three decades of experience and knowledge with respect to the RCBS's operations, financial condition, and related business issues. The documents submitted herewith, referenced herein or otherwise relied upon by me for purposes of this Declaration are the business records of the RCBS, prepared and kept in ordinary and regularly conducted business activity of the RCBS, and used by me for those purposes. If I were called upon to testify, I could and would testify competently to the facts set forth herein, and I am authorized to submit this Declaration on behalf of the RCBS.

3.　　On April 1, 2024, the RCBS initiated this case by filing a voluntary Chapter 11 Petition ("Petition Date").

A. Description of the Diocese of Sacramento

4.　　The current Bishop of the RCBS is the Most Reverend Jaime Soto, who was appointed as co-adjutor bishop by Pope Benedict XVI, on October 11, 2007. Bishop Soto then became the Bishop of Sacramento on November 29, 2008, upon the retirement of his predecessor, the Most Reverend William Weigand.

5.     The Diocese of Sacramento (the "<u>Diocese</u>")[1] was established by the Holy See in Rome in 1886, is comprised of 20 counties in the northern and eastern regions of California and includes 42,597 square miles. The Diocese now includes 102 parishes, 36 missions, three Newman Catholic Centers, 36 Catholic parish schools and five Catholic high schools. The total population of this area is more than 3.6 million people, and the total Catholic population is more than 1 million people.

6.     The primary role of the RCBS is to provide resources, spiritual leadership, direction, support, planning, programming, leadership development and other services to the parishes, schools, cemeteries and various other Catholic-based social and community service organizations that operate in the Diocese and serve individuals of the Roman Catholic faith, those of other faiths, and those who do not follow any faith tradition. The RCBS employs approximately 63 full-time and 37 part-time lay employees and 9 clergy employees.

7.     As a religious institution, the RCBS has no significant ongoing for-profit business activities or business income. The RCBS's receipts principally come from parish offertory assessment/service fees, schools assessment/service fees, a share of the Annual Catholic Appeal to support the Bishop's social service, educational, and seminarian education expenditures (held in trust for named ministries only), financial and administrative service fees/reimbursements for services provided to the Non-Debtor in Possession Catholic Entities (defined below), donations, grants, financial contributions from some supporting organizations, and endowment earnings. In 2023, the RCBS's fiscal year total revenues were approximately $28.6 million. The RCBS operates on a fiscal year ending June 30.

8.     The Debtor in Possession will file its schedules shortly after the Petition Date. The petition indicates assets exceeding $100 million and liabilities exceeding $100 million.

B. <u>Legal Structure of the RCBS, Parishes and other Non-Debtor in Possession Catholic Entities</u>

9.     The RCBS was incorporated in 1897 and is a California corporation sole (see California Corporations Code section 10000 et. seq.). In addition to the RCBS, there are numerous

---

[1]  The term "Diocese" is used herein exclusively to refer to geographic territory under the jurisdiction of the RCBS, and the terms RCBS, or Debtor in Possession are used herein exclusively to refer to the secular legal embodiment of the Diocese.

1   entities that are separately incorporated and perform various functions in the Diocese territory.

2   These include parishes, supporting organizations, social service agencies and educational

3   ministries.

4          10.     In October to December 2011, the RCBS separately incorporated all but one of the

5   then existing parishes into separate California corporations sole.[2]  At the time of the 2011 parish

6   incorporation, the RCBS held title in its name to the real property where each parish was located.

7   As part of the incorporation of the parishes, the RCBS created a written irrevocable trust for the

8   real property on which the parishes are located, for which the RCBS is the trustee.  Each parish

9   holds the beneficiary interest in the real property on which its respective parish and school is

10  located.  The RCBS remains the record title holder, subject to the terms of the irrevocable trust.

11         11.     The operation and administration of a parish is governed by the provisions of the

12  1983 Code of Canon Law, the statutes of the State of California and the United States Government,

13  and the administrative policies and procedures promulgated by the Bishop of the RCBS.  The

14  pastor/priest administrator represents the parish in all juridical matters.  He is charged with the

15  responsibility of seeing to it that the goods of the parish are administered in accordance with all

16  relevant canons.  The Canons specify that each parish must have both a Finance Council and a

17  Pastoral Council to serve as consultive bodies of lay parishoners that aid the pastor/priest

18  administrator and parish stewards in the management of the parish.

19         12.     Canon 1284 requires that all administrators fulfill their office with the diligence of

20  a good householder.  The Canon lists specific duties and responsibilities involving the management

21  of goods, financial actions, keeping books, preparing reports, and budgeting.  These responsibilities

22  for administrators, financial personnel and all parish organizations, along with the directives of the

23  Bishop of RCBS, are supported and guided in the RCBS Parish Financial Management Handbook.

24         13.     The RCBS provides various services to parishes (collectively, the "Parishes")

25  pursuant to a written Parish Services Agreement with each parish.  Pursuant to the Parish Services

26  Agreement, the RCBS, among other things, assists the parish in: (a) procuring, maintaining and

27

28  [2] St. Dominic Benicia remains an unincorporated association under California law, as the articles of incorporation were signed in March 2012, but the California Secretary of State rejected the filing.

-4-

administering (i) health and dental insurance for priests and (ii) health, dental, life, workers' compensation and unemployment insurance for parish lay employees, and (b) developing and administering a pooled self-insurance program, including the negotiation and acquisition of insurance and excess insurance coverage for general liability, sexual misconduct liability, auto liability, errors and omissions liability, employment practices liability, special events/outside users liability, property casualty, auto physical, earthquake, flood, workers' compensation, unemployment and fidelity.

14.     The Parish Services Agreements also cover services specified under Canon Law and policy of the Roman Catholic Church. The Parish Services Agreements cover legal, pastoral and other services to the Parishes. The agreements contain an indemnification provision providing that the RCBS shall indemnify the parish for any loss, cost or expense incurred as a result of claims stemming from the actual or alleged sexual misconduct of priests or deacons assigned to a parish by the bishop.

15.     Under the Parish Services Agreements, the RCBS is paid a sliding-scale service fee or assessment based on the Parish offertory, which is the normal Sunday and Holy days collection taken up at Mass. The Parishes also reimburse the RCBS for all services subcontracted by the RCBS to third parties as billed or assessed by the RCBS, including insurance and pension plans.

16.     The RCBS provides financial and administrative services to The Parochial Fund, Inc. and The Catholic Foundation of the Diocese of Sacramento, Inc. (discussed below) through separate Financial and Administrative Services Agreements. Generally, the Financial and Administrative Services agreements provide for the RCBS to perform services including accounting, cash management, administrative and other services for a monthly fee that varies depending on the supporting organization and the breadth of the services provided under each agreement.

**Supporting Organizations**

17.     There are five separately incorporated nonprofit religious corporations that support the RCBS's work in the Diocese (collectively, "Supporting Organizations"). Under the statutes and regulations administered by the Internal Revenue Service, a "supporting organization" is a

charity that exists to support one or more different exempt organizations while carrying out its exempt purposes. See Internal Revenue Code §509(a)(3). To qualify for public charity status as a supporting organization, however, the entity must have a connection to the corporation(s) it supports. Merely supporting another entity is not sufficient, and instead the supporting organization must have a relationship with its supported organization sufficient to ensure that the supported organization is afforded particular attention to the operations of the supporting organization. In the case of the Supporting Organizations listed below, the connection between the RCBS and each corporation can be found in such features as provisions in the articles of incorporation where the supporting organization status is expressly stated, and in the fact that the RCBS is the sole corporate "member" of each of them (see California Corporations Code §9310 (pertaining to "members" of nonprofit religious corporations)), and that I, as CFO of RCBS, and the Vicar General of the RCBS, either serve on the board of directors of the Supporting Organization, serve as an officer to the corporation, or both. As the corporate member of the Supporting Organizations, the RCBS has limited reserve powers over certain aspects of corporate governance, including authority to approve amendments to bylaws and articles of incorporation, dissolution of the corporation, and appointment of directors. Notwithstanding the connection required for public charity status as a 509(a)(3) supporting organization, the Supporting Organizations listed below function independently in their daily operations, under supervision and management of their respective fiduciary boards of directors, and without any ongoing control or intervention from RCBS.

18. The Catholic Foundation of the Diocese of Sacramento, Inc. ("Foundation") was incorporated as a nonprofit religious corporation on December 24, 2003. The purpose of the Foundation is to support and benefit the RCBS and the parish corporations sole, including fundraising and fund development, the prudent investment of the funds, and making payments to or for the use of the supported organizations.

19. The ONE Campaign of the Diocese of Sacramento, Inc. ("ONE Campaign") was incorporated as a nonprofit religious corporation on May 24, 2013. The purpose of the ONE Campaign was to undertake a one-time Diocesan wide capital campaign to raise purpose restricted funds to meet specific needs identified in the campaign materials. The entity was created for this

one capital campaign and still exists because not all of the purpose restricted funds have been distributed for the specific purposes.

20.    The Parochial Fund, Inc. ("Parochial Fund") was incorporated as a nonprofit religious corporation on June 4, 2002.  The purpose of the Parochial Fund is to hold in trust, as deposits, those non-permanently restricted excess funds owned by parish corporations sole in the Diocese of Sacramento and to make those funds available to other parishes, schools, and agencies in the diocese as loans to facilitate capital projects.  No RCBS funds are in the Parochial Fund, nor have any RCBS funds ever been in the Parochial Fund.

21.    The Catholic Funeral and Cemetery Services of the Diocese of Sacramento, Inc. ("CFCS") was incorporated as a nonprofit religious corporation on September 19, 2011.  CFCS owns and operates 12 cemeteries located in the Diocese and provides funeral and end-of-life services in three funeral homes in the Diocese.  CFCS has a wholly owned subsidiary, Sacramento Catholic Family Insurance Services, Inc., a California for-profit corporation ("SCFIS"), which provides funeral and end-of-life services through a funeral home known as George L. Klumpp Chapel of Flowers located in Sacramento.

22.    St. Patrick's Fund for Children, Inc. ("SPFC") is a nonprofit religious corporation that was originally incorporated on July 16, 1987.  The corporation's name and status from a nonprofit public benefit corporation were changed by amendment to its articles in 2012.  The purpose of the SPFC is to support the work of the RCBS in service to children and young people.

**Social Services Agencies**

23.    There are seven separately incorporated nonprofit public benefit corporations that provide social services in the Diocese (collectively, "Social Service Agencies").  RCBS is the sole corporate member of each of the Social Service Agencies (see California Corporations Code §5310, et seq. providing for "members" of public benefit corporations).  The reason for the corporate membership in the Social Service Agencies, however, is not related to IRS requirements applicable to section 509(a)(3) supporting organization.  Instead, the RCBS is the sole corporate member of the Social Service Agencies because it reflects the Bishop's ecclesiastical and canonical responsibility to oversee the social service religious ministries of the diocese, and because each

Social Service Agency forms a part of that charitable and ministerial work. As with its corporate membership in the Supporting Organizations, the RCBS possesses limited reserved powers in that role, and the Social Service Agencies otherwise operate autonomously in their day-to-day affairs, under the governance of an independent fiduciary board of directors with no control or intervention from the RCBS. With the exception of Catholic Charities of Sacramento, no employee or clergy of the RCBS is an officer or director of any of any of the Social Service Agencies.

24.    Catholic Charities of Sacramento, Inc. ("Catholic Charities") was originally incorporated as a nonprofit public benefit corporation on June 6, 1979. The corporation's name was changed in 1993. Catholic Charities is made up of member agencies and programs which provide services to the poor throughout the 20 counties of the RCBS, regardless of their religious, social, or economic backgrounds. Catholic Charities collaborates with local communities to provide social service programs such as counseling, mental health and immigration services, low-income housing, and other supportive services to the poor and vulnerable.

25.    Sacramento Food Bank & Family Services ("SFBFS") was originally incorporated as a nonprofit public benefit corporation on September 18, 1998. The corporation's name was changed in 2005. SFBFS addresses food insecurity in the region by acquiring and supplying food to local food banks, and supports the poor and working poor move toward a path of financial independence and self-sufficiency. SFBFS offers Sacramento residents as well as immigrants and refugees who have chosen to make Sacramento their home a wide variety of essential resources.

26.    Northern Valley Catholic Social Service, Inc. ("NVCSS") was incorporated as a nonprofit public benefit corporation on March 16, 2004. NVCSS provides support to local communities in Butte, Shasta, Siskiyou, Tehama and Trinity counties through the following programs and services: advocacy, housing, healthy habits, mental health services and wellness, support for families and children, disaster case management services, and immigration services.

27.    Catholic Charities of Yolo-Solano, Inc. ("CCYS") was incorporated as a nonprofit public benefit corporation on February 18, 2014. CCYS provides individuals and families in Yolo and Solano counties of all faiths and beliefs with food access, housing assistance, counseling, and immigration legal services.

28.     Mother Teresa Maternity Home, Inc. ("MTMH") was incorporated as a nonprofit public benefit corporation on May 30, 2014. MTMH provides a temporary residence, in a safe environment, for pregnant women in need to help them complete their pregnancy in safety and comfort, and to assist them with referrals to existing community services and agencies.

29.     Upper Room Dining Hall, Inc. ("URDH") was incorporated as a nonprofit public benefit corporation on July 13, 2015. URDH provides meals and other services to members of the Placerville community living under the strain of poverty.

30.     Rancho Cordova Food Locker, Inc. ("RCFL") was incorporated as a nonprofit public benefit corporation on February 4, 2020. RCFL is the center for food distribution, and a variety of programs and services to help people in need in the Rancho Cordova area.

**Educational Ministries**

31.     There are nine separately incorporated nonprofit religious corporations that support the educational ministries of the Diocese (collectively, "Incorporated Educational Ministries"). As is the case with the Social Service Agencies, the RCBS is the sole corporate "member" of each Incorporated Educational Ministry, and the RCBS similarly holds that status in recognition of the Bishop's ecclesiastical and canonical responsibility over the Catholic educational ministries of the diocese. The RCBS holds limited reserve powers relative to each Incorporated Educational Ministry entity, and each of those corporations is otherwise governed by an independent and autonomous fiduciary board of directors, without any day-to-day control or intervention from the RCBS.

32.     Camp ReCreation, Inc. ("Camp ReCreation") was incorporated as a nonprofit religious corporation on October 2, 2015. Camp ReCreation has been serving people with developmental disabilities since 1983. Each year, Camp ReCreation provides a residential summer camp program and engaging year-round activities for its participants to inspire fun, friendship, social interaction and spiritual growth – all while creating valuable respite for parents and caregivers. Camp ReCreation also strives to increase the awareness and acceptance of persons with developmental disabilities in the greater community.

33.     Radio Santisimo Sacramento, Inc. ("Radio Santisimo") was incorporated as a

nonprofit religious corporation on April 6, 2011. Radio Santisimo is Northern California's first Spanish-language Catholic radio station and was created to provide religious programming to the Spanish-speaking population within the diocese of Sacramento. The station broadcasts at several different frequencies in different regions across the diocese, including 1240 AM, 1340 AM, and 95.7 FM.

34.    The San Juan Diego Center, Inc. ("SJDC") was incorporated as a nonprofit religious corporation on June 6, 2011. The SJDC corporation operates the San Juan Diego Retreat Center and community meeting facility in Linda, California.

35.    St. Francis Catholic High School of the Diocese of Sacramento, Inc. ("St. Francis HS") was incorporated as a nonprofit religious corporation on December 13, 2012. St. Francis HS is an all-girls, college preparatory Catholic high school in East Sacramento.

36.    St. Patrick-St. Vincent Catholic High School of the Diocese of Sacramento, Inc. ("St. Patrick HS") was incorporated as a nonprofit religious corporation on February 8, 2019. St. Patrick HS is a Catholic college preparatory high school located in Vallejo.

37.    The SUCCEED Academy of the Diocese of Sacramento ("SUCCEED") was incorporated as a nonprofit religious corporation on June 17, 2009. SUCCEED operates St. Patrick's SUCCEED Academy School, a K-8 elementary school located in Sacramento on the site of the former St. Patrick's Orphanage for Children. RCBS annually donates significant financial support for scholarships and other student support.

38.    Catholic Schools Association of Sacramento, Inc. ("CSAS") was incorporated as a nonprofit religious corporation on June 11, 2013. CSAS assists with the governance of individual parish schools in the Sacramento region by providing group consulting services to those schools in areas that include management, marketing, communications, and administration. CSAS has no assets.

39.    Catholic Schools of the Northern Sacramento Valley, Inc. ("CSNSV") was incorporated as a nonprofit religious corporation on March 23, 2010. CSNSV has the same purpose and provides the same services as CSAS but supports parish schools in the region of the diocese north of the metropolitan Sacramento area. CSNSV has no assets.

40.    Catholic Schools of Solano, Inc. ("CSS") was incorporated as a nonprofit religious corporation on September 27, 2012.  CSS also has the same purpose and provides the same services as CSAS but supports parish schools in the region of the diocese from Davis to Vallejo.  CSS has no assets.

41.    The Parishes, Supporting Organizations, Social Services Agencies and Educational Ministries are hereafter referred to collectively as (the "Non-Debtor Catholic Entities)."

42.    Except as otherwise stated herein and my other supporting declarations, each of the Non-Debtor Catholic Entities owns its own property, finances its own activities, and is responsible for its own business and corporate activities, including the management of its employees all under the governance of each of their boards of directors.  The Non-Debtor Catholic Entities have not sought bankruptcy relief and are not debtors in this bankruptcy case.  However, certain parishes and schools are named in many of the pending abuse lawsuits.  Because liability for alleged abuses appear to be in effect diocesan liabilities and they are all covered under the same insurance policies, the RCBS has been defending those claims.  In addition, I am informed and believe that it is the Debtor in Possession's position that the automatic stay halts those lawsuits including those against any Non-Debtor Catholic Entities that are covered by the same insurance as the RCBS.

C.  The Clergy Sex Abuse Crisis and the RCBS Response

43.    Horrific sins that violate every teaching and tradition of the Church,[3] and that shock the conscience of people of every faith, were committed in both the Church as a whole and in the RCBS, most notably in the period from the 1950s to the 1990s.  Members of the clergy and others took advantage of their positions of trust and respect in the community and inflicted upon innocent children horrific and sinful sexual abuse (the "Abuse").  The results have been devastating to many innocent victims.

44.    The RCBS remains steadfast in its belief that it must continue to atone for the horrible sin of clergy sexual abuse.  The sickening evil that was perpetrated upon innocent children – and the failure of Church leadership to address it appropriately – has caused unfathomable pain

---

[3] References to the term "Church" refer to the universal church of Roman Catholic belief, seated in the Vatican and currently headed by Pope Francis.

that endures.  It is these sins that brought the RCBS to this place.  The pain inflicted on survivors lasts a lifetime, and so our atonement must be a lifetime commitment.  The Church as a whole, and the RCBS in particular, are committed to providing for all survivors of Abuse, known and yet to be known, in a fair, just and equitable manner with the available resources of the RCBS.

45.    Going back at least as far as 1987, the RCBS has had protocols in place to respond to reports of sexual abuse and related issues.  Among other things, in 1995 the RCBS established its first written policy for receiving and responding to reports of sexual abuse of minors and that policy has been maintained and updated through the current date.  The RCBS also published updated requirements for child abuse prevention and reporting requirements to clergy, principals and administrators.  Under the protocols, survivors are offered assistance in the form of counseling and pastoral assistance.  Such assistance has been provided to survivors for up to as long as twenty years and continues to this date.  The RCBS continues to follow all reporting laws and provides regular education of clergy and staff on those reporting laws.

46.    The *Charter for the Protection of Children and Young People* (the "Charter") was originally established by the United States Conference of Catholic Bishops in June 2002.  The intent of the Charter is to promote healing and reconciliation with victim/survivors of sexual abuse of minors, to guarantee an effective response to allegations of sexual abuse of minors, to ensure the Church's accountability, and to protect the Faithful in the future.  It was revised in 2005, 2011, and 2018.  The Charter implemented a "one strike" policy regarding clergy serving in any active, public ministry, and also included:

- permanent removal from active ministry of any priest or deacon with a substantiated allegation of sexual abuse of a minor;
- requirement of criminal background checks for adults, including clergy, who work with children and youth;
- implementation of educational programs for the prevention of child sexual abuse for both adults and children;
- provision of behavioral guidelines/ethical standards for ministry;
- establishment of outreach for survivors; and
- creation of a review board to make recommendations to the diocesan bishop about substantiation of accusations against clergy and to oversee policy implementation.

47.    Since the adoption of the Charter, the Bishops of the U.S. have engaged independent

auditing firms to assess the compliance of American dioceses with the Charter's requirements. As part of that audit process, the RCBS provides information to the auditors on an annual basis regarding any new reports of abuse during the audit period, the status of criminal background checks of employees and volunteers who supervise minors at parish schools or other activities, and statistics on safe environment training for minors and employees. Over the entire course of those annual audits, the RCBS has continuously been found in compliance with the Charter. To more specifically illustrate the RCBS's commitment to protecting children from abuse and providing healing for those who have been harmed, examples of specific measures taken by the RCBS to comply with the Charter and its additional steps include:

- established a Diocesan Safe Environment Program
- established a Safe Environment Coordinator in each parish and school to monitor and assure compliance with the Charter;
- hiring a Diocesan Safe Environment Coordinator to oversee implementation of all requirements to promote the safety of children and youth;
- responding as needed to assist people who have been abused or affected by abuse;
- in some instances, offering counseling for claimants whose cases have been dismissed or settled;
- establishing an Independent Review Board comprised of lay people and clergy, to review claims of sexual abuse and advise the Bishop;
- requiring fingerprinting of employees and clerics;
- requiring Safe Environment education for priests, deacons, staff and volunteers in all parishes and schools;
- providing age-appropriate education for school and religious education children to equip them with the skill to help them protect themselves from abuse; and
- participating in annual compliance audits, conducted by independent auditors, to review the implementation of policies and procedures regarding the protection of children.

48. To promote transparency and trust, in 2019 the RCBS engaged in a review of the files of all Clergy who had served in the Diocese of Sacramento going back to 1950, whether they were in active ministry, retired, deceased, or had left the diocese, to determine if there were any allegations of misconduct in their files. While the review included a review for financial or adult misconduct, the primary focus was on potential sexual misconduct with a child by those individuals. This process included an independent review of each file by an expert team of legal professionals led by a former executive assistant director of the FBI and a founding member of the Office of

Child Protection at the U.S. Conference of Catholic Bishops. By the time the project was completed, the RCBS had reviewed the personnel records for every bishop, priest, and deacon (almost 1,500 in all) who had served in the Diocese of Sacramento over a span of seven decades.

49. Using information compiled and verified by the independent review of clergy files, in 2019 the RCBS also published a comprehensive list of names of clergy against whom previous credible claims had been made. The list is maintained on the RCBS website, and its release was covered by the Herald, which is the diocesan magazine, as well as other media. The credibly accused list maintained by the RCBS is unique in California, if not the entire U.S., in that not only does it provide the names and assignment record of credibly accused clergy, it also provides anonymized information for each and every survivor whose allegations have been determined credible, including the date and location of the alleged abuse, the age range of the survivor at the time when the RCBS received the report, and a non-detailed description of the abuse.

50. Since its creation in 2002, the Diocesan Independent Review Board ("IRB") has met regularly to discuss any matters of concern, and as needed, to give the Bishop advice regarding claims brought forward. Allegations reported to the RCBS are investigated and the results are provided to the IRB to assist in its assessment of whether the claim is deemed credible. The IRB provides its assessment in writing to Bishop Soto, and upon acceptance of the recommendation by the Bishop, the allegations are added to the credibly accused list maintained on the diocesan website. Further, the IRB takes an active role in reviewing, at least annually, diocesan policies concerning sexual misconduct and the code of conduct for those who work with or minister to minors.

51. The Diocesan resources for the Protecting Our Children are available on its website at https://www.scd.org/safe-environment. These resources include the Diocesan Sexual Misconduct Administrative Policies and Procedures, Code of Pastoral Conduct, Safe Haven Training, Guidelines for Adults Working with Children, Fingerprinting/Background Checks, Personal Safety Education Programs for Children, Parent Education and Support Materials, Enhanced Screening of All Seminarian Candidates, Charter Compliance/Audit Results, Safe Environment Ministry & Family Resources, information about the Independent Review Board, how

1  to report abuse, contact information for the Diocesan Safe Environment Coordinator, and other

2  resources.

3         52.    By implementing the foregoing safe environment procedures and safeguards, the

4  RCBS has pledged its strong commitment to preventing abuse from ever occurring again in the

5  Diocese, to ensuring that any Church worker who does abuse is dealt with swiftly and decisively,

6  and to atoning for those sins with anyone who has been harmed by the grievous sins of workers

7  connected to the Church. Rebuilding the confidence of our congregants, the faithful and society as

8  a whole is a paramount goal for everyone in the Diocese.

9  D.  History of Addressing Claims Made by Survivors

10         53.    In 2002, California enacted one of the first statute of limitations revival windows in

11  the U.S. During the resulting one-year window, which lasted during calendar year 2003, 34 civil

12  claims were filed against RCBS. In 2005, as a result of negotiations across several mediation

13  sessions, the parties reached a global settlement of all the pending claims for a total of $35 million.

14  RCBS ultimately had to initiate a separate lawsuit against its insurers to recover amounts owed

15  under applicable insurance policies, and ultimately settled that action as well, but in the end RCBS

16  paid approximately half of the total settlement out of its own finances.

17         54.    Between 2005 and 2019, additional claims were made against RCBS by individuals

18  claiming abuse by clergy. During that time period, the RCBS reached settlements with

19  approximately 26 survivors, paying them a total amount in excess of $15.7 million. Approximately

20  82% of the total amount of settlement payments to survivors during that period (almost $13 million)

21  was paid from RCBS finances.

22         55.    In 2019, in a further effort to address acts of abuse by Church personnel, the RCBS

23  joined five other dioceses in California in establishing an Independent Compensation Program

24  ("ICP"). The dioceses engaged Ken Feinberg, a nationally recognized expert in managing claims

25  programs, to administer the ICP. The ICP provided any survivor with the ability to file a claim

26  against RCBS, without the need for a lawyer. Under the program protocol, Mr. Feinberg and his

27  colleague Camille Biros reviewed each submission, and qualified claims received settlement offers

28  in amounts set independently by the ICP administrators (Feinberg/Biros). Claimants who received

a settlement offer were provided with independent legal counsel, at no cost, to review the settlement agreement. If they signed and returned the agreement, the RCBS paid the award without any ability to contest the amount. Ten individuals accepted settlement offers made by the administrators, and RCBS paid out $1.625 million to resolve those claims, all from RCBS finances.

E. Events Leading to the Commencement of the Chapter 11 Case

56.     Until the most recent legislative reopening of the statute of limitations in California in 2020, the RCBS has maintained financial viability while funding compensation for Abuse survivors and past litigation regarding claims of sexual abuse. While no amount of money can adequately compensate a survivor for the harms she or he has suffered, since 2000 the RCBS and its insurers have paid $52.8 million in legal settlements in an effort to fulfill the RCBS's responsibility for abuse of minors by a diocesan clergy.

57.     In 2019, however, the California Legislature enacted AB 218, the most recent legislative revival of the statute of limitations, which established a three-year revival window from 2020 to 2022. As part of the window created by AB 218 and based on the most up to date information we have been able to compile as of the date of this declaration, approximately 260 individuals filed civil actions in which the RCBS is named as a defendant. All the pending claims have been grouped together in a coordinated proceeding in Alameda County, and all but very limited discovery in those matters has been stayed since the creation of the proceeding in 2020.

58.     Consistent with its policies and protocols, the RCBS and its counsel Greene & Roberts LLP have investigated and taken action to try to determine the background of every allegation of abuse received directly by the RCBS since 2000. With regard to the pending civil claims, however, there are significant challenges associated with obtaining sufficient information to determine the credibility of the allegations, particularly given the discovery stay in the coordinated proceeding. Nevertheless, by the end of 2023, the RCBS had gathered basic information on nearly all of the pending civil claims, including general descriptions of the nature, duration, and location of the alleged abuse. Based on our experience in past situations, the RCBS expects the initial demands for those pending claims to be more than $2 million per claim. Based on these demands, I am informed and believe that the RCBS's total exposure is likely to exceed its

assets. This volume of lawsuits puts the RCBS in immediate, dire financial distress and in need of a forum to resolve these claims while continuing to serve the faithful and those in need.

F.　The Reorganization Case

59.　The RCBS has not sought relief in chapter 11 to avoid responsibility for past misconduct by clergy, nor to hide the truth or to deny claimants their day in court. The RCBS is committed to pursuing the truth on all allegations of abuse. Bishop Soto has apologized profusely for the past misconduct of the personnel of the Diocese and meets with survivors whenever requested to bring comfort to such individuals. The Diocese has established stringent standards for the training and background assessment (including fingerprint criminal background checks) of all employees, clerics and volunteers who will likely interact with children and young people.

60.　The RCBS enters chapter 11 as a further step toward fulfilling its moral obligation to try to compensate all Abuse survivors fairly and within a reasonable amount of time. It would not be fair for any single plaintiff to recover a disproportionate share of the limited funds available from the RCBS and its insurance simply because that plaintiff's case proceeds to trial first. Neither the timing of claimant's readiness to seek redress nor the financial status of the RCBS at any given point should determine the appropriate outcome for all stakeholders, including survivors, other creditors and the faithful, in this bankruptcy case.

61.　The RCBS is not the first, nor does it expect to be the last, Catholic entity or religious institution to file bankruptcy in response to the numerous lawsuits seeking to hold dioceses accountable for atrocious harms against minors. These chapter 11 cases have allowed religious and nonprofit institutions to resolve globally the valid claims and emerge from chapter 11 with a plan, acceptable to a majority of survivors and other parties in interest, to address and compensate, both monetarily and non-monetarily, survivors while continuing to serve their respective constituents and operate in the ordinary course. The RCBS desires a similar outcome in this bankruptcy case.

62.　The RCBS has an obligation to the Catholic faithful it serves, to the donors who have entrusted the Diocese with donations to serve the Diocese's missions, and to the larger communities it serves, to continue the ministries of the Church. In order to fulfill these obligations, the RCBS must survive.

63.　　I understand the Bankruptcy Court provides a forum and the Bankruptcy Code provides a mechanism whereby all the claims can be determined and paid on a fair and equitable basis and ensures that all claimants with similarly situated claims are essentially treated the same. The RCBS requires the Bankruptcy Court's protection and the protection of the bankruptcy laws to make fair and equitable payment of the claims against it, including the survivors of abuse, trade creditors, the Parishes and others.

64.　　The RCBS files chapter 11 to protect and preserve the RCBS's assets that are properly available for distribution to the RCBS's creditors and ensure that whatever assets can be marshaled are distributed equitably to all creditors, not just a few; and to continue the work of the Church within the Diocese to the fullest extent possible using the resources dedicated to those purposes.

65.　　The RCBS intends to negotiate a plan of reorganization as early as possible which will: (a) allocate fair compensation among the legitimate competing interests for such property; (b) provide a process to fully, fairly and expeditiously resolve claims of Abuse survivors; and (c) permit the RCBS to carry on the RCBS's essential ministries and services so the RCBS can continue to meet the needs of the Non-Debtor Catholic Entities, parishioners, and others who rely on the RCBS's ministry, education, and charitable outreach.

66.　　An expeditious reorganization process is extremely important given the Debtor in Possession's available resources and because it is a not-for-profit religious corporation. The Diocese is dependent upon the charity of its faithful to sustain its very existence. This bankruptcy may cast a shadow upon the RCBS, the Parishes, and the various Non-Debtor Catholic Entities and their numerous ministries. Some faithful may believe that, going forward, their charitable gifts to any Catholic entity will be diverted from their intended purpose and used to satisfy the claims of the Debtor in Possession's creditors rather than to fund the ongoing ministries of the Church that benefit the faithful and their community. The Debtor in Possession will use its best efforts to dispel this misconception by communicating openly and often about the chapter 11 process. However, I respectfully submit that the best way to alleviate any of these concerns is to address the insurmountable abuse claims in the bankruptcy forum and emerge from bankruptcy as soon as

reasonably possible.

I declare under penalty of perjury that the foregoing it true and correct. Executed on March 21, 2024, at Sacramento, California.

Thomas McNamara