29

PAUL J. PASCUZZI, State Bar No. 148810
JASON E. RIOS, State Bar No. 190086
THOMAS R. PHINNEY, State Bar No. 159435
  FELDERSTEIN FITZGERALD WILLOUGHBY
PASCUZZI & RIOS LLP
500 Capitol Mall, Suite 2250
Sacramento, CA  95814
Telephone:    (916) 329-7400
Facsimile:    (916) 329-7435
Email:      ppascuzzi@ffwplaw.com
          jrios@ffwplaw.com
          tphinney@ffwplaw.com

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
ORI KATZ, State Bar No. 209561
ALAN H. MARTIN, State Bar No. 132301
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:    (415) 434-9100
Facsimile:    (415) 434-3947
Email:      okatz@sheppardmullin.com
          amartin@sheppardmullin.com

Proposed Attorneys for The Roman Catholic
Bishop of Sacramento

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF CALIFORNIA
### SACRAMENTO DIVISION

| | |
|---|---|
| In re | Case No. 24-21326 |
| THE ROMAN CATHOLIC BISHOP OF SACRAMENTO, | Chapter 11 |
| | DCN:  FWP-2 |
| Debtor in Possession. | Date:      April 4, 2024<br>Time:      10:00 a.m.<br>Location:  Courtroom 35 (Dept. C)<br>Judge:    Hon. Christopher M. Klein |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEBTOR IN POSSESSION'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (1) AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, OPERATIONAL BANK ACCOUNTS AND RELATED INVESTMENT ACCOUNTS; (2) AUTHORIZING MAINTENANCE OF EXISTING BUSINESS FORMS, (3) EXCUSING COMPLIANCE WITH SECTION 345(b); (4) AUTHORIZING CONTINUED USE OF CURRENT INVESTMENT POLICY; AND (5) SCHEDULING A FINAL HEARING**

# **Table of Contents**

I. JURISDICTION ...................................................................................................5

II. BACKGROUND .................................................................................................6

III. RELIEF REQUESTED .......................................................................................7

IV. FACTUAL BACKGROUND FOR RELIEF REQUESTED ...............................9

    A.    Cash Management System ......................................................................9

    B.    Bank Account and Investment Account List.........................................10

MCNAMARA DECL. ¶10........................................................................................11

    C.    Sources and Uses of Cash Receipts......................................................11

        1.    Cash Sources ...............................................................................11

        2.    Main Sources of Disbursements .................................................12

    D.    Bank Accounts Related to the Debtor's Cash Management System.....12

        1.    Debtor in Possession's General Operating Accounts................13

        2.    Restricted and Special Bank Accounts .......................................13

    E.    Investment Accounts .............................................................................16

    F.    Corporate Credit Card Program ............................................................18

V. LEGAL ARGUMENT .........................................................................................18

    A.    Maintaining the Debtor in Possession's Current Bank Accounts Is in the Best Interests of the Estate and Is Authorized Pursuant to Section 105(a) ...........18

    B.    Maintaining the Debtor's Existing Business Forms is in the Best Interest of the Estate ........................................................................................................21

    C.    Maintenance of the Debtor in Possession's Existing Cash Management System is in the Best Interest of the Estate ...........................................23

    D.    Continued Use of Investment Practices ...............................................24

VI. NOTICE .............................................................................................................28

VII. WAIVER OF BANKRUPTCY RULE 6004(H) ...............................................28

VIII. CONCLUSION ...............................................................................................28

# Table of Authorities

**CASES**

*In re Arriva Pharmaceuticals, Inc.*, Case No. 07-42767 (Bankr. N.D. Cal. Sept. 11, 2007 order) ..........................................................................................................24

*In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987)....................................19

*In re Diocese of Buffalo, N.Y.*, 621 B.R. 91 (Bankr. W.D.N.Y. 2020) ........................................25

*In re eStyle, Inc.*, Case No. 08-13518 (Bankr. C.D. Cal. April 18, 2008 order) ..........................22

*In re Gold Standard Baking, Inc.*, 179 B.R. 98, 101-02 (Bankr. N.D. Ill. 1995).........................19

*In re Gold Standard Baking, supra*, at 105-106 (same) ...............................................................22

*In re Hansaben Investments, LLC*, Case No. 22-30258 (Bankr. N.D. Cal. May 27, 2022)................................................................................................................22, 24

*In re Heller Ehrman LLP*, Case No. 08-32514 (Bankr. N.D. Cal. Dec. 30, 2008 order)................................................................................................................22, 24

*In re King Mountain Tobacco Co., Inc.*, 623 B.R. 323, 332 (Bankr. E.D. Wash. 2020)........................................................................................................................27

*In re Roman Catholic Bishop of Stockton*, Case No. 14-20371 (Bankr. E.D. Cal. Jan. 24, 2014) ....................................................................................................22

*In re Roman Catholic Bishop of Stockton*, Case No. 14-20371-C-11 (Bankr. E.D. Cal. Jan. 24, 2014 order) ........................................................................................24

*In re Service Merchandise, Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) ..................27

*In re The Roman Catholic Archbishop of San Francisco,* Case No. 23-30564 (Bankr. N.D. Cal. Nov. 2, 2023) [ECF-266] ........................................................22

*In re The Roman Catholic Archbishop of San Francisco,* Case No. 23-30564 (Bankr. N.D. Cal. Nov. 2, 2023) [ECF-266] ........................................................24

*In re The Roman Catholic Bishop of Oakland*, Case No. 23-40523 (Bankr. N.D. CA June 12, 2023) [ECF 120] ..............................................................22, 24

*In re The Roman Catholic Bishop of Santa Rosa*, Case No. 23-10113 (Bankr. N.D. CA June 14, 2023) [ECF 252]........................................................................22, 24

*In re Young*, 205 B.R. 894, 897 (Bankr. W.D. Tenn 1997) ........................................................22

*In re ZF in Liquidation LLC fka Zacky Farms, LLC*, Case No. 12-37961-B-11 (Bankr. E.D. Cal. Nov. 5, 2012 order) ..............................................................22, 24

**STATUTES**

11 U.S.C. § 345(a).......................................................................................................................24

11 U.S.C. § 345(b) ...................................................................................................25

28 U.S.C. § 157(b) .....................................................................................................5

28 U.S.C. § 959(b) ...................................................................................................25

28 U.S.C. §§ 1408 and 1409 ......................................................................................5

28 U.S.C. §§ 157 and 1334 ........................................................................................5

Bankruptcy Code section 105(a) ..............................................................................19

Bankruptcy Code section 345 ....................................................................................8

Bankruptcy Code sections 105(a) and 345(b) ............................................................5

Bankruptcy Code sections 1107 and 1108 .................................................................6

Bankruptcy Section 345(b) .......................................................................................25

Cal. Prob. Code Section 18503(b) ............................................................................25

**OTHER AUTHORITIES**

UST Guidelines 4.4.6 ...............................................................................................18

**RULES**

Bankruptcy Local Rule 2015-2 .................................................................................18

Bankruptcy Rule 2002 ..............................................................................................28

Bankruptcy Rule 6004(h) .........................................................................................28

Local Rule 2015-2 ....................................................................................................29

Rule 2015-2 ................................................................................................................5

The Roman Catholic Bishop of Sacramento ("RCBS" or the "Debtor in Possession"), the Debtor in Possession in the above-captioned chapter 11 case (the "Bankruptcy Case"), hereby submits this Memorandum of Points and Authorities in support of its motion (the "Motion") for entry of an order: (1) authorizing the continued use of existing cash management system, operational bank accounts and related investment accounts; (2) maintaining existing business forms, (3) excusing compliance with section 345(b) to the extent it is applicable; (4) authorizing continued use of current investment policy; and (5) Scheduling a Final Hearing. In support of its Motion, the Debtor in Possession relies upon the *Declaration of Thomas McNamara in Support of Chapter 11 Petition and First Day Motions* ("McNamara Background Decl."), the *Declaration of Stephen J. Greene in Support of Chapter 11 Petition and First Day Motions* ("Greene Decl."), and the *Declaration of Thomas McNamara* filed in support of the Motion ("McNamara Decl."),[1] as well as all exhibits filed in support of the declarations. In further support of the Motion, the Debtor in Possession respectfully represents as follows:

## I.

## JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory bases for the relief requested herein are Bankruptcy Code[2] sections 105(a) and 345(b) and Rule 2015-2 of the Local Rules of Practice of the United States Bankruptcy Court for the Eastern District of California (the "Bankruptcy Local Rules").

2. The RCBS does not, by filing its petition for relief and other documents in the Bankruptcy Case, waive any of its rights under any applicable law, including, without limitation, the Code of Canon Law, the First Amendment of the United States Constitution, the Constitution for the State of California, California's law on corporations sole (California Corporations Code

---

[1] Capitalized terms not otherwise defined in the Motion shall have the same meanings ascribed to them in the McNamara Background Decl., the Greene Decl., and the McNamara Decl.

[2] Unless otherwise indicated, all section references in the Motion are to the "Bankruptcy Code," 11 U.S.C. §§ 101, *et seq.*

§§ 10000-10015), the Religious Freedom Restoration Act, the church autonomy doctrine, charitable trust law, California trust law, and the rights to object to disclosure of information and to contend that certain assets discussed in the Motion are not property of the estate.

## II.

## BACKGROUND

3. On April 1, 2024 ("Petition Date"), the RCBS filed a voluntary Chapter 11 petition. The Debtor in Possession remains in possession of its estate, and neither a trustee nor an examiner has been requested or appointed. The Debtor in Possession is operating and managing its business and financial affairs as a debtor in possession under Bankruptcy Code sections 1107 and 1108.

4. The RCBS filed this Bankruptcy Case to reorganize its financial affairs pursuant to a plan of reorganization that will, among other things, fairly, justly, and equitably compensate survivors of sexual abuse by clergy or others associated with the RCBS and bring healing to survivors, parishioners and others affected by past acts of sexual abuse. The RCBS requires the Bankruptcy Court's protection and the protection of the bankruptcy laws to make fair and equitable payment on all of the claims against it, including the claims by survivors of abuse, trade creditors, Parishes and others, while continuing its ministries and support it offers to Catholic Parishes and communities.

5. The Diocese of Sacramento (the "Diocese")[3] was established in 1886, is comprised of 20 counties in the northern and eastern regions of California and includes 42,597 square miles. The Diocese now includes 102 parishes, 36 missions, three Newman Centers, 36 Catholic parish schools and five Catholic high schools. The total population of this area is more than 3.6 million people, and the total Catholic population is more than 1 million people.

6. The primary role of the RCBS is to provide resources, spiritual leadership, direction, support, planning, programming, leadership development and other services to the parishes, schools, cemeteries and various other Catholic-based social and community service organizations that

---

[3] The term "Diocese" is used herein exclusively to refer to geographic territory under the jurisdiction of the RCBS, and the terms RCBS, Debtor, or Debtor in Possession are used herein exclusively to refer to the secular legal embodiment of the Diocese.

operate in the Diocese and serve individuals of the Roman Catholic faith, those of other faiths, and those who do not follow any faith tradition. The RCBS employs approximately 65 full-time and 37 part-time lay employees and 11 clergy employees.

7.     The RCBS's receipts principally come from parish offertory assessment/service fees, schools assessment/service fees, a share of the Annual Catholic Appeal to support the Bishop's social service, educational, and seminarian education expenditures (held in trust for named ministries only), financial and administrative service fees/reimbursements for services provided to the Non-Debtor Catholic Entities (defined below), donations, grants, financial contributions from some supporting organizations, and endowment earnings. In 2023, the RCBS's fiscal year total revenues were approximately $28.6 million. The RCBS operates on a fiscal year ending June 30.

8.     Additional information regarding the circumstances leading to the commencement of the Bankruptcy Case and information regarding the Debtor in Possession's operations and structure is set forth in the McNamara Background Decl.

**III.**

**RELIEF REQUESTED**

9.     By the Motion, the Debtor in Possession seeks, *inter alia*, entry of an order, in substantially the form appended to the Exhibit List as ***Exhibit 1*** filed contemporaneously herewith, (a) waiving the Bankruptcy Local Rules and United States Trustee Guidelines ("UST Guidelines") to the extent necessary in order for the Debtor in Possession to continue its use of its existing cash management system, (b) authorizing the Debtor in Possession to continue using, as needed, its prepetition Bank Accounts (defined below) and business forms, including a waiver of the requirement that the legend "debtor in possession" be imprinted on any existing checks and business forms, and (c) authorizing the Debtor in Possession to continue the use of its existing cash management system and accounting policies and practices. The Debtor in Possession also seeks to continue using its commercial pre-funded credit cards, debit cards, and investment policies during this Bankruptcy Case, without posting any bonds as required under section 345(b) of the Bankruptcy Code. The Debtor in Possession seeks this authorization to ensure its orderly transition into bankruptcy and to help administer its operations efficiently while avoiding the disruptions,

distractions, delays, and significant expense that otherwise would inevitably divert the Debtor in Possession's attention from urgent matters during the initial stages of its bankruptcy case.

10.     As noted below in more detail, all of the relevant banks where the RCBS's bank accounts (the "Bank Accounts") are located are FDIC-insured banking institutions that have complied with the United States Trustee's (the "U.S. Trustee") special depository procedures under Bankruptcy Code section 345 and are on the U.S. Trustee's list of authorized depositories for the Eastern District of California.[4]   The Debtor in Possession will use its best efforts to have these accounts designated as "Debtor in Possession" to the extent possible by the relevant banks.

11.     The Debtor in Possession also has certain investment, money market, and certificate deposit accounts (the "Investment Accounts") that the Debtor in Possession requests Court authority to continue to maintain without the need to comply strictly with Bankruptcy Code Section 345: its Christian Brothers Investment Services, Inc. ("CBIS Accounts"), its Merrill Lynch Investment Accounts, and its River City Bank CD Account. These Investment Accounts yield between 0% and 20% per year.

12.     The RCBS's current cash management system has been in place substantially in its current form for the last 25 years. The RCBS has implemented the cash management system described below to ensure the orderly management of the RCBS's operations. Due to the complicated nature of the RCBS's cash management system, the Debtor in Possession respectfully requests that it be authorized to continue to operate the cash management system in the ordinary course of business.

13.     At a minimum, the Court should grant relief on an interim basis to allow the Debtor in Possession to meet and confer with the U.S. Trustee and a creditors committee once appointed because without such relief the disruption to the Debtor in Possessions operations would have significant negative consequences for the estate.

---

[4] As noted below, the RCBS holds a Certificate of Deposit account at River City Bank as an investment.

**IV.**

**FACTUAL BACKGROUND FOR RELIEF REQUESTED**

**A.      Cash Management System**

14.      The Debtor in Possession operates an intricate cash management system (the "Cash Management System"[5]), which is illustrated on ***Exhibit 2*** to the Exhibit List.  McNamara Decl. ¶6. The Debtor in Possession primarily uses its Cash Management System to, among other things, receive or pay: (i) unrestricted gifts, bequests, and collections; (ii) restricted donations, including distributions of the Annual Catholic Appeal (the "ACA"); (iii) payments for various insurance coverages paid by RCBS on behalf of other non-diocesan entities; (iv) commercial and residential rental income; (v) fees and reimbursements for administrative services provided to other Catholic Non-Debtor Entities; (vi) investment income; and (vii) non-RCBS payroll funding on a pass-through basis.  Additionally, in the ordinary course of business, the RCBS is required to make the following disbursements: (a) mission-driven disbursements; (b) ordinary trade payables and operating expenses; (c) payroll; (d) commercial insurance premiums; and (e) employer portion of employee benefits.  *Id.*

15.      The RCBS has a Finance Council comprised of Rev. Christopher R. Frazer (Vicar General), Rev. Mark R. Richards (Judicial Vicar), and eight independent lay advisors.  McNamara Decl. ¶7.  The Finance Council generally meets approximately eight to 10 times per year.  *Id.*  The Finance Council is responsible for advising on all matters of financial concern, and to provide consent to certain investment decisions, and financial actions in accordance with Canon Law.  *Id.* They also participate in the development of the RCBS's annual budget and make a recommendation for its approval to the Bishop.  *Id.*

16.      The RCBS Investment Committee (the "Investment Committee"), a subset of the Finance Council, works to help the RCBS act as a prudent investor, investing in a diversified and balanced manner.  McNamara Decl. ¶8.  The Investment Committee was established by the Finance

---

[5] For purposes of this Motion, Cash Management System shall also include the Debtor in Possession's use of its accounting methods, business forms, credit card program, and Investment Accounts, as further detailed in this Motion.

Council and consists of a CFO and five lay professionals with strong investment backgrounds. *Id.* The Investment Committee meets at least quarterly (and more frequently as necessary) to establish investment and asset allocation policies and to review investment performance. *Id.*

17.     The following sets forth RCBS' Cash Management System by providing: (i) first, a list of the Bank Accounts and Investment Accounts, (ii) second, a description of the sources and uses of funds, (iii) third, a detailed description of the Bank Accounts, (iv) fourth, a detailed description of the Investment Accounts, and (v) fifth, a discussion regarding the credit card/debit card programs.

**B.     Bank Account and Investment Account List**

18.     The Debtor in Possession maintains the following Bank Accounts and Investment Accounts:

| Identifying Schematic Number on Exhibit 2 | Account Name | Balance as of February 29, 2024 (unless otherwise noted) | |
|---|---|---|---|
| **Bank Accounts at Bank of America** | | | |
| 1 | Main Operating Account (#2553) | $ 353,717 | |
| 2 | Self-Insurance Fund (#2620) | $ 1,833,972 | |
| 3 | Priest Health Benefits (#7693) | $ 110,054 | C |
| 4 | Employee Benefits (#8027) | $ 1,185,420 | |
| 5 | Clearing Account - Payroll and other non-payroll ACH Payments (#2592) | $ 53,203 | |
| 6 | Workers' Comp Claims - LWP (#8082) | $ 187,315 | |
| 7 | Priest Pension (#7514) (Restricted) | $ 115,524 | |
| 8 | Lay Employee Retirement (#1397) (Restricted) | $ 342,363 | |
| 9 | Special Collections (#2596) (Restricted) | $ 916,852 | |
| 10 | Donor Restricted Fund (#1392) | $ 28,336 | |
| 11 | Endowments (#2594) (Restricted) | $ 194,452 | |
| 12 | Online Giving (#8894) (Restricted) | $ 110,497 | |
| 13 | Bishop Special Account (#8877) | $ 72,338 | |
| **Bank Accounts at Chase Bank** | | | |
| 14 | Newman Chico (#0119) | $ 10,671 | |
| 15 | Newman Davis (#0588) | $ 20,786 | |
| 16 | Newman Sac (#5613) | $ 5,183 | |
| **Bank Account at US Bank** | | | |
| 17 | Camp Pendola US Bank (#7146) | $ 58,123 | B |
| **Investment Account US Bank** | | | |
| 18 | Charitable Gift Annuities (#2920) (Restricted) | $ 328,935 | B |
| **Bank Account at Notre Dame Credit Union** | | | |
| 19 | Notre Dame Credit Union (#2091) | $ 1,033,461 | C |

-10-

| River City Bank CD Account | | | |
|---|---|---|---|
| 20 | CD (#4638) | $ 271,232 | A |
| **Investment Account at Charles Schwab** | | | |
| 21 | Investment Account (Unrestricted) (#8681) | $ 1,349 | A,C |
| **Investment Accounts at Merrill Lynch** | | | |
| 22 | Working Capital (#4016) | $ 23,898,702 | |
| 23 | RCB SIF (#2393) | $ 10,307,891 | |
| 24 | RCB New Parish Fund (#4020) | $ 5,584,153 | |
| 25 | Funded Depreciation (#4A56) | $ 3,592,448 | |
| 26 | Special Collections (#2402) (Restricted) | $ 107,334 | |
| 27 | Seminarian Account (x2590) | $ 6,853,100 | |
| 28 | Bishop Special Investment Account (x4233) | $ 245,028 | |
| **Investment Account at CBIS (Donor Restricted)** | | | |
| 29 | CRI BOND FUND-INSTL (#3-17) | $ 1,178,690 | |
| 30 | CRI OPPORTUNISTIC BOND FUND-INSTL (#3-19) | $ 1,194,884 | |
| 31 | CRI INTERNATIONAL SMALL-CAP FUND-INSTL (#3-28) | $ 98,527 | |
| 32 | CRI INTERNATIONAL EQUITY FUND-INSTL (#3-35) | $ 813,155 | |
| 33 | CRI EQUITY INDEX FUND-INSTL (#3-36) | $ 420,763 | |
| 34 | CRI SMALL-CAP FUND-INSTL (#3-42) | $ 185,095 | |
| 35 | CRI MULTI-STYLE US EQUITY FUND-INSTL (#3-46) | $ 647,553 | |
| **Investment Account at CBIS (Restricted Endowment)[6]** | | | |
| 36 | CRI BOND FUND-INSTL (#5-17) | $ 3,191,648 | |
| 37 | CRI OPPORTUNISTIC BOND FUND-INSTL (#5-19) | $ 3,210,333 | |
| 38 | CRI INTERNATIONAL SMALL-CAP FUND-INSTL (#5-28) | $ 382,217 | |
| 39 | CRI INTERNATIONAL EQUITY FUND-INSTL (#5-55) | $ 2,945,354 | |
| 40 | CRI EQUITY INDEX FUND-INSTL (#5-56) | $ 1,600,850 | |
| 41 | CRI SMALL-CAP FUND-INSTL (#5-42) | $ 670,674 | |
| 42 | CRI MULTI-STYLE US EQUITY FUND-INSTL (#5-46) | $ 2,374,288 | |

*Notes:*
A- 12.31.23 Balance
B- 01.31.24 Balance
C- Account scheduled to be closed by 03.31.24

McNamara Decl. ¶10.

## C. Sources and Uses of Cash Receipts

### 1. Cash Sources

19. As described in more detail in the McNamara Declaration, the RCBS is the beneficiary of various restricted and unrestricted gifts, bequests and collections during the year.

---

[6] These funds are held in trust at the Catholic Foundation.

-11-

McNamara Decl. ¶¶11-12. RCBS categorizes restricted funds as "Custodial," indicating that they are set aside for a specific purpose and are held in a restricted Bank Account. McNamara Decl. ¶12. The funds held in the Bank Accounts and Investments Accounts identified as "Restricted" are subject to charitable restrictions and constitute restricted funds, which are not available to creditors of the estate. McNamara Decl. ¶13. The RCBS maintains records to account for the differing character of funds it holds, as described above. *Id*.

20.     In addition to these gifts, bequests and collections, the RCBS receives (a) reimbursements for the respective costs of health insurance and commercial insurance programs from Participating Entities, (b) rental income from real properties, (c) Parish Assessment/Service Fees for various administrative support services for Parishes in the Diocese of Sacramento pursuant to Parish Service Agreements with each of the parishes, (d) Parish and school fees related to payroll, and (e) fees and reimbursements for administrative services provided to other Catholic Non-Debtor Entities. McNamara Decl. ¶¶14-17.

### 2.     Main Sources of Disbursements

21.     The RCBS main categories of disbursements are related to (a) mission driven disbursements, (b) ordinary accounts payable, (c) commercial insurance premiums and deductibles, and (d) employee payroll and benefits. McNamara Decl. ¶¶18-21.

### D.     Bank Accounts Related to the Debtor's Cash Management System

22.     As of the Petition Date, the Debtor in Possession's Cash Management System includes a total of 16 Bank Accounts (the "Bank Accounts"), 12 of which are held with BofA, three with Chase Bank, and one with US Bank (collectively, the "Cash Management Banks"). McNamara Decl. ¶22. One of the BofA accounts (Workers Comp Claims Acct #8082) is an Imprest Account held and managed by third parties. *Id*.

23.     In the ordinary course of business, the RCBS maintains the Bank Accounts to facilitate the financial operations of its central administrative offices. McNamara Decl. ¶23.

///

///

///

**1.**     <u>Debtor in Possession's General Operating Accounts</u>

24.     The RCBS maintains two main operating checking accounts at BofA (Account #2553) (the "<u>Main Operating Account</u>") and (Account #2592) (the "<u>Clearing Account</u>"). McNamara Decl. ¶24.

25.     The Main Operating Account's receipts primarily consist of grants received every six months from the ACA, unrestricted donations and bequests, registration fees for Camp Pendola Retreat Center events, contributions from Supporting Organizations, parish offertory and school assessments/service fees (that pay via check) and reimbursements of expenses from the BofA Self-Insurance Account (#2620), the BofA Online Giving Account (#8894) and the BofA Special Collections Fund Account (#2596).[7] McNamara Decl. ¶25. The Main Operating Accounts disbursements primarily consist of operating expenses that are paid via check, transfers to the Clearing Account for payroll, payment of Camp Pendola program expenses, and various mission related donations for educational and social service ministries in the Diocese. *Id.*

26.     The Clearing Account's receipts primarily consist of parish offertory and school assessments/service fees (that pay via ACH), transfers from the Main Operating Account for Diocese payroll, retirement housing rental income, and reimbursements for payroll fees. McNamara Decl. ¶26. The disbursements out of the Clearing Account primarily consist of funding for diocese payroll and operating expenses that are paid via ACH (for example, tuition subsidies and seminarian stipends). *Id.*

**2.**     <u>Restricted and Special Bank Accounts</u>

27.     In addition to the two Operating Accounts (#2553 and #2592), the RCBS maintains 13 Bank Accounts at BofA, Chase and US Bank as described in more detail below. McNamara Decl. ¶27.

28.     The BofA Self-Insurance Fund Account (#2620) receipts consist primarily of Insurance Premiums collected from Insurance Participating Entities included in the insurance

---

[7] Three percent of donations received to online giving account and two percent of donations received to the Special Collections account get transferred to the Main Operating Acct (#2553) as administrative fees.

programs (Parishes, schools, Supporting Organizations and social service agencies) and transfers from the Self-Insurance Reserve Fund at Merrill Lynch (#2393), as needed. McNamara Decl. ¶28. The disbursements consist of Commercial Insurance Premiums, transfers to the Workers Comp Claims BofA Imprest Account (#8082), self-insured losses, unemployment insurance claim reimbursements to EDD, loss prevention expenses and other related administrative and professional fees. *Id*.

29.　　The BofA Employee Benefits Account (#8027) receives money from Benefit Allocations Systems ("BAS"), the third party agent that collects premiums from parishes, schools, and other participating organizations in the Benefits Program. McNamara Decl. ¶29. The disbursements from this account consist of payments of premiums to Sunlife (Life insurance, Long-Term Disability and ADD policies) and RETA (medical, dental and vision) as well as payments for benefit related professional fees (RETA, BAS, others). *Id*.

30.　　The BofA Workman's Comp Claims Account (#8082) (Imprest Account) receives funds from the BofA Self Insurance Fund (#2620). McNamara Decl. ¶30. The disbursements consist of payments initiated by the self-insurance administrator LWP for workers' compensation claims. *Id*.

31.　　The BofA Priest Pension Account (#7514) is a restricted account that receives Pension Plan Contributions from participating employers that are then remitted to US Bank, the Trustee for the Priest Defined Benefit Pension Plan. McNamara Decl. ¶31.

32.　　The BofA Lay Employee Pension Retirement Account (#1397) is a restricted account that receives Lay Employee Plan Contributions from participating employers (approximately 8.5% of payroll) that are then remitted to Standard Retirement Services, Inc., the administrator for the 403(b) Retirement Plan (approximately 6% of payroll) and to US Bank, the Trustee for the frozen Lay Employee Pension Plan (approximately 2.5% of payroll). McNamara Decl. ¶32.

33.　　The BofA Special Collections Account (#2596) is a restricted account that receives donations and then remits those funds to the applicable national or local Mission Driven Program, net of a 2% administrative fee that RCBS retains. McNamara Decl. ¶33.

34.     The BofA Donor Restricted Account (#1392) is a restricted account that receives donor restricted donations and bequests and either distributes directly for the restricted purpose or reimburses RCBS for the same.  McNamara Decl. ¶34.

35.     The BofA Endowments Account (#2594) is a restricted account that receives permanently restricted donations and bequests and disburses earnings for the restricted purposes. McNamara Decl. ¶35.

36.     The BofA Online Giving Clearing Account (#8894) is a restricted account that receives donations paid via online from individual Parish members.  McNamara Decl. ¶36.  RCBS, on a quarterly basis, then remits the funds to the designated parishes, net of a 3% fee RCBS retains as an administrative fee.  *Id.*

37.     The Chase Bank Newman Chico Account (#0119) receives from RCBS funds to cover the program budget for the year and miscellaneous student fees.  McNamara Decl. ¶37.  All program expenditures are made from this account for this college Youth Ministries chapter at CSU Chico campus.  *Id.*

38.     The Chase Bank Davis Account (#0588) receives from RCBS funds to cover the program budget for the year and miscellaneous student fees.  McNamara Decl. ¶38.  All program expenditures are made from this account for this college Youth Ministries chapter at UC Davis campus.  *Id.*

39.     The Chase Bank Sac Account (#5613) receives from RCBS funds to cover the program budget for the year and miscellaneous student fees.  McNamara Decl. ¶39.  All program expenditures are made from this account for this college Youth Ministries chapter at CSU Sacramento campus.  *Id.*

40.     The US Bank Camp Pendola Account (#7146) is used to collect participant registration fees for youth and family camp programs.  McNamara Decl. ¶40.  The monies are then swept to the Main Operating Account (#2533) from which program expenses are paid.  *Id.*

41.     The BofA Bishop Special Account (#8877) receives stipends intended for the diocesan Bishop, or his delegate, from Masses celebrated at various parishes including

confirmations.  McNamara Decl. ¶41.  The Bishop, at his discretion, makes donations out of this checking account.  *Id*.

42.    There also are six bank accounts for ministries that the RCBS recently discovered are under its tax identification number but no one at the RCBS is an authorized signor or controls these accounts (the "Additional Bank Accounts").  McNamara Decl. ¶41.  The funds in these accounts did not originate from the RCBS, nor does the RCBS control or operate these ministries.  *Id*.  These accounts are for the Sacramento Cursillo, the Legion of Mary Sacramento Comitium, Divine Mercy (in process of being closed), Sister of the Holy Rosary of Fatima (two accounts), Filipino Apostolate CDS, and Catholic HIV/AIDS Ministry.  *Id*.  The total amount in these six accounts is approximately $69,000.  *Id*.  The Additional Bank Accounts have not been listed in the RCBS's general ledger, do not contain funds of the RCBS, and the RCBS does not use or control the operation of the Additional Bank Accounts; however, because they are listed under the Debtor in Possession's tax identification number, the Debtor in Possession hereby requests that the Court authorize the continued use of the Additional Bank Accounts in the ordinary course of business without the need to designate such accounts as debtor in possession accounts or otherwise complying with the requirements of Bankruptcy Code section 345(b).  *Id*.  Without this relief, these ministries could suffer irreparable harm if unable to access their funds or suffer a delay in use of those funds, as they need to cover day-to-day operating costs.  *Id*.  Similar relief was granted in the Roman Catholic Archbishop of San Francisco case (order cited below) without opposition by the United States Trustee's Office.  *Id*.

**E.    Investment Accounts**

43.    The RCBS maintains several Investment Accounts to diversify its holdings and yield the maximum reasonable net return on such money, taking into account the duration and safety of such deposit or investment.  McNamara Decl. ¶43.  These funds are conservatively invested short term treasury bills, certificates of deposit, and a diversified mix of mutual funds.  *Id*.  As of February 29, 2024, the respective balances were approximately: Designated - $50.9 million; Restricted - $4.5 million; and Endowments - $14.5 million.  *Id*.  These restricted Investment Accounts are maintained at FDIC-insured banking institutions that have complied with the U.S. Trustee special depository

procedures under Bankruptcy Code section 345 and are on the U.S. Trustee's list of authorized depositories for the Eastern District of California, except for the accounts at Merrill Lynch and CBIS. *Id.* Merrill Lynch is a wholly owned subsidiary of BofA, which is FDIC-insured and on the U.S. Trustee's authorized depository list. *Id.* CBIS was founded in 1981 by the De La Salle Christian Brothers, is headquartered in Chicago, Illinois and serves Catholic investors around the world. *Id.*

44. RCBS's CBIS Accounts are used to invest Donor Restricted monies in various fixed income and equities mutual funds. McNamara Decl. ¶44. The CBIS Accounts fixed income investments holdings currently yield between 0% to 5% interest per year and current equity investments holdings yield between 5% and 20%.[8] *Id.* These accounts are endowment funds that are donated for restricted purposes where the RCBS can only use any income generated for the restricted purpose; the principal cannot be used for any purpose.

45. RCBS's Merrill Lynch Investment Accounts are primarily used to invest in short term United States Treasury Bills and United States Treasury Notes. McNamara Decl. ¶44. Any cash in these accounts is FDIC insured up to $250,000. The balance is held in United States Treasury Bills and Notes. The Merrill Lynch Investment Accounts currently yield between 4% to 5.25% interest per year. *Id.* United States Treasury Bills and United States Treasury Notes are backed by the full faith and credit of the United States government. See https://treasurydirect.gov/help-center/marketable-faqs/. *Id.*

46. RCBS's River City Account is a time certificate of deposit. McNamara Decl. ¶46. The River City Bank CD currently yields approximately 4% interest per year and matures June 14, 2024. *Id.* River City Bank is on the U.S. Trustee's list of authorized depositories for the Eastern District of California, although the listing indicates that River City Bank is not accepting new debtor-in-possession accounts. *Id.*

47. The RCBS's US Bank Charitable Gift Annuities investment account is a restricted account whereby US Bank acts as trustee for certain charitable gift annuities as permitted by

---

[8] Per Beacon Pointe Institutional Investments Q4 2023 Market Review Report.

California Insurance Code section 11520 et. seq.  There is a written trust agreement whereby US Bank is the trustee in charge of and in custody of this account.  Any termination of this trust must be approved by the California Department of Insurance.  Thus, the RCBS requests permission to leave this account as is under the circumstances.

**F.      Corporate Credit Card Program**

48.      The RCBS uses corporate "credit" cards primarily to pay miscellaneous business expenses, generally consisting of program expenses, lodging and other travel related expenses incurred by the employees working at RCBS.  McNamara Decl. ¶ 47.  There are roughly 55 credit cards in use at RCBS, with approximately $45,000 total monthly "credit" card charges.  *Id*.  The cards are pre-funded monthly to a collective maximum limit of approximately $50,000 for all cards, with each card generally subject to a $2,500 spending limit.  *Id*.  The cards are administered through a third-party provider, Bill, Spend & Expense.  *Id*.  There is no additional collateral provided to the card provider since the use of the cards is limited to the prefunded amounts.  *Id*.  In addition to these prefunded "credit" cards, the RCBS has debit cards issued for each of the three Chase Bank Accounts for the Newman Centers.  *Id*.  A total of six debit cards are issued to directors and managers and are used for program expenditures.  *Id*.

**V.**

**LEGAL ARGUMENT**

**A.      Maintaining the Debtor in Possession's Current Bank Accounts Is in the Best**

**Interests of the Estate and Is Authorized Pursuant to Section 105(a)**

49.      The U.S. Trustee has established certain operating guidelines for debtors in possession.  One such provision requires a chapter 11 debtor in possession to open new debtor in possession bank accounts and to close all existing accounts.  *See* UST Guidelines Section 3.  The UST Guidelines also require that new bank accounts be opened in certain financial institutions designated as authorized depositories by the United States Trustee.  *See* UST Guidelines 3(a).  In addition, Bankruptcy Local Rule 2015-2 requires the chapter 11 debtor indicate "debtor in possession" on any signature card for a debtor's bank account.

50.     The Debtor in Possession seeks a waiver under Bankruptcy Code section 105(a), of the United States Trustee's requirements and Bankruptcy Local Rule 2015-2 regarding the closing and re-opening of new bank accounts to the extent necessary for the Bank Accounts and completely for the Investment Accounts.

51.     The Debtor in Possession will make efforts to convert its Bank Accounts, other than the one Imprest Account which is held and managed by a third party, to debtor in possession accounts as soon as reasonably practicable.  However, this process is expected to take some time outside the Debtor in Possession's control.  Any requirement for an immediate conversion to "debtor in possession" bank accounts would not be feasible and would unnecessarily disrupt the Debtor in Possession's operations and would not provide any significant benefit to the Debtor in Possession's estate, its creditors, or parties in interest.  More specifically, the Debtor in Possession has a complex and efficient cash management system with approximately 16 Bank Accounts at three banking institutions, including the one Imprest Account held and managed by a third-party.  To require the Debtor in Possession to immediately close and reopen these Bank Accounts would unduly burden the estate and cause countless interruptions to operations.  Converting bank accounts to debtor-in-possession accounts is an intricate and involved process that will need to be applied across multiple accounts at multiple banking institutions and take time to complete.  Moreover, as noted above, all of the Debtor in Possession's Bank Accounts are held at FDIC insured institutions on the US Trustee's approved list of institutions for maintaining debtor in possession accounts.

52.     Courts have long recognized that the strict enforcement of bank account closing requirements does not serve the rehabilitative purposes of chapter 11.  Accordingly, courts regularly have waived such requirements and permitted debtors to maintain their existing bank accounts and cash management systems, treating such a request as a relatively "simple matter."  *See, e.g.*, *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987).  Moreover, the UST Guidelines do not have the force of law, and the Court may excuse compliance with certain of them.  *See In re Gold Standard Baking, Inc.*, 179 B.R. 98, 101-02 (Bankr. N.D. Ill. 1995) (U.S. Trustee lacks statutory authority to direct how a debtor should conduct its ordinary course business operations).  All parties in interest to the reorganization case, including the Debtor in Possession, non-RCBS

-19-

entities, employees, trade vendors and other creditors, and parishioners within the Diocese will be best served by preserving operational continuity and avoiding the disruption and delay to the RCBS's financial activities and payroll that would necessarily result from requiring the immediate closing of the Debtor in Possession's existing accounts and opening new "debtor in possession" accounts. The Debtor in Possession should be permitted to work through this process in an orderly way that preserves the Debtor in Possession's ability to operate and make timely post-petition payments, including but not limited to payroll and the other disbursements described above.

53.     The Debtor in Possession requests authority to maintain and continue to use the existing Bank Accounts (restricted and unrestricted) in the names and with the account numbers existing immediately prior to the Petition Date until the orderly conversion of the Debtor in Possession's Bank Accounts to debtor in possession accounts can be completed. The Debtor in Possession further requests authority to deposit funds in, and withdraw funds from, any such accounts by all usual means, including, but not limited to, checks, wire transfers, automated clearinghouse transfers, electronic funds transfers and other debits, and to treat the existing accounts for all purposes as debtor in possession accounts.

54.     The Debtor in Possession notes that some of its restricted Bank Accounts hold endowments and restricted funds that are not available to pay general debts and operational expenses of the Debtor in Possession. Endowments are funds provided for use for a specific purpose. The RCBS's endowments specify that the RCBS may only use the income generated from the endowment and not the principal. Thus, maintaining the endowment funds in income generating accounts is necessary to realize their value and intended purpose, and the availability of the funds is limited to the purpose of the endowment. Similarly, the RCBS's restricted funds include donations, as described above, which have been made for a specified purpose and are limited to use for such purposes. The Debtor in Possession contends that these endowments and restricted funds are not property of the estate and/or are not available to pay general estate expenses. Therefore, requiring the Debtor in Possession to disrupt its operations and expend its resources converting these accounts would provide no benefit to the Debtor in Possession's estate.

55.     The Debtor in Possession has endeavored to ensure that no checks in payment of prepetition obligations remain outstanding as of the Petition Date.  To further ensure against the payment of prepetition debts – except for prepetition debts that the Court specifically authorizes to be paid – the RCBS will stop payment on any checks for prepetition obligations that are outstanding as of the Petition Date and will begin issuing new checks post-petition with a significant gap in the numbering sequence, to make it easier to distinguish between pre-petition and post-petition checks.

56.     The Debtor in Possession further requests authority for the banks at which it maintains existing accounts, subject to and in accordance with the terms of any account agreements and applicable non-bankruptcy law, to accept and honor all representations or instructions from the Debtor in Possession as to which checks, drafts, wire transfers, or other transfers (each, an "Item" and, collectively, the "Items") should be honored or dishonored.  The Debtor in Possession requests that its banks have absolute authority to follow such representations and instructions, regardless of the particular transferee named on an Item, the date of such Item (pre-petition or post-petition), and the Banks' knowledge or belief as to the existence of Court authorization for the transfer; provided, however, that the Banks will not be required to honor any Item for which there are insufficient funds in the applicable account.

57.     The Debtor in Possession also requests a waiver of the requirement of UST Guideline 3, which requires the Debtor in Possession to establish specific bank accounts for tax payments. The Debtor in Possession believes that its tax obligations can be paid most efficiently out of its existing accounts, and its monthly operating reports will permit the U.S. Trustee to monitor tax payments.  The Debtor in Possession submits that the creation of new debtor in possession accounts designated solely for tax obligations is unnecessary and inefficient.

**B.      Maintaining the Debtor's Existing Business Forms is in the Best Interest of the Estate**

58.     To minimize administrative expense and delay, the Debtor in Possession requests authority to continue to use its correspondence and business forms, including, but not limited to, purchase orders, letterhead, envelopes, charitable solicitation materials, and checks (collectively, the "Business Forms"), substantially in the form that they existed immediately prior to the Petition Date, without reference to the RCBS's status as a debtor in possession.  The Debtor in Possession

has made no secret of the serious issues it faces as described in the McNamara Background Declaration and the McNamara Declaration. The financial condition of the Debtor in Possession and the status of the Abuse cases against the Debtor in Possession have been the subject of local media scrutiny for several years. This Bankruptcy Case will likely generate substantial public reports and comments, both locally and nationally. It is most likely that any party to a transaction with the Debtor in Possession will be aware of its status as a debtor in possession.

59. Moreover, the Court has the power to allow the Debtor in Possession to deviate from the UST Guidelines on this point. *See, e.g.*, *In re Young*, 205 B.R. 894, 897 (Bankr. W.D. Tenn 1997) (U.S. Trustee may not require debtor to imprint the words "debtor in possession" on his checks); *see also In re Gold Standard Baking, supra*, at 105-106 (same). In other large cases, bankruptcy courts in various California Districts have allowed debtors to use their prepetition business forms. *See In re The Roman Catholic Archbishop of San Francisco,* Case No. 23-30564 (Bankr. N.D. Cal. Nov. 2, 2023) [ECF-266]; *see also In re The Roman Catholic Bishop of Santa Rosa*, Case No. 23-10113 (Bankr. N.D. CA June 14, 2023) [ECF 252]; *see also In re The Roman Catholic Bishop of Oakland*, Case No. 23-40523 (Bankr. N.D. CA June 12, 2023) [ECF 120]; *see also In re Roman Catholic Bishop of Stockton*, Case No. 14-20371 (Bankr. E.D. Cal. Jan. 24, 2014); *see also In re Hansaben Investments, LLC*, Case No. 22-30258 (Bankr. N.D. Cal. May 27, 2022); *see also In re ZF in Liquidation LLC fka Zacky Farms, LLC*, Case No. 12-37961-B-11 (Bankr. E.D. Cal. Nov. 5, 2012 order); *see also In re eStyle, Inc.*, Case No. 08-13518 (Bankr. C.D. Cal. April 18, 2008 order); and *see also In re Heller Ehrman LLP*, Case No. 08-32514 (Bankr. N.D. Cal. Dec. 30, 2008 order).

60. If the Debtor in Possession is not permitted to maintain and use its existing accounts and to continue to use its existing Business Forms, the resulting prejudice will include: (a) disruption in the ordinary financial affairs and business of operations of the Debtor in Possession, to the detriment of employee morale and vendor and parishioner relationships; (b) delay in the administration of the Debtor in Possession's estate and to the pastoral care and services provided to all of the parishioners within the Diocese; and (c) cost to the Debtor in Possession and its estate to set up new systems, open new accounts, and print new Business Forms. If the Debtor in Possession

exhausts its existing supply of checks during these chapter 11 cases, the Debtor in Possession will print or order checks with the designation "Debtor-in-Possession" and the corresponding bankruptcy case number.

**C.     Maintenance of the Debtor in Possession's Existing Cash Management System is in the Best Interest of the Estate**

61.     The Cash Management System (as described herein, the "Cash Management System") is maintained in the ordinary course and is essential to the Debtor in Possession's ongoing operations, especially to services provided by it to the non-RCBS entities under the Servicing Agreements and other arrangements.  The preservation and continuation of the Cash Management System is essential to the Debtor in Possession's continued operations.

62.     The existing Cash Management System, which includes the Bank Accounts, Investment Accounts, and the use of credit cards, allows the Debtor in Possession to segregate, trace and account properly for restricted funds and manage all of its cash flow needs centrally.  The existing Cash Management System includes necessary accounting controls to enable the Debtor in Possession, as well as its creditors and the Court, to trace funds through the system and ensure all transactions are documented and ascertainable.  The existing Cash Management System has proven to be an efficient and effective system to manage the Debtor in Possession's cash flow and supports the Debtor in Possession's obligations under the Servicing Agreements, which provide a significant source of income for the Debtor.  In accordance with past practices, the Debtor in Possession will continue to maintain current records with respect to all transactions involving the Debtor in Possession's Cash Management System.  Given its central role in funding numerous of the Debtor in Possession's vital operating expenses, such as performing under the Servicing Agreements, collecting and maintaining restricted funds, payroll, employee benefits and other payables, the Debtor in Possession's inability to continue using the Cash Management System would severely, and perhaps irreparably, disrupt its operations and its mission.

63.     In addition, given the Debtor in Possession's financial structure, it would be difficult, if not impossible, for the Debtor in Possession to establish an entirely new system of accounts and a new cash management system simply to comply with Bankruptcy Local Rule 2015-2 and the UST

Guidelines.  In other large cases, bankruptcy courts in various California Districts have allowed debtors to continue to use their existing cash management systems.  *See In re The Roman Catholic Archbishop of San Francisco,* Case No. 23-30564 (Bankr. N.D. Cal. Nov. 2, 2023) [ECF-266]; s*ee also In re The Roman Catholic Bishop of Santa Rosa*, Case No. 23-10113 (Bankr. N.D. CA June 14, 2023) [ECF 252]; *see also In re The Roman Catholic Bishop of Oakland*, Case No. 23-40523 (Bankr. N.D. CA June 12, 2023) [ECF 120]; *see also In re Hansaben Investments, LLC*, Case No. 22-30258 (Bankr. N.D. Cal. May 27, 2022); *see also In re Roman Catholic Bishop of Stockton*, Case No. 14-20371-C-11 (Bankr. E.D. Cal. Jan. 24, 2014 order); *see also In re ZF in Liquidation LLC fka Zacky Farms, LLC*, Case No. 12-37961-B-11 (Bankr. E.D. Cal. Nov. 5, 2012 order); *see also In re Heller Ehrman LLP*, Case No. 08-32514 (Bankr. N.D. Cal. Dec. 30, 2008 order); and *see also In re Arriva Pharmaceuticals, Inc.*, Case No. 07-42767 (Bankr. N.D. Cal. Sept. 11, 2007 order).

**D.** **Continued Use of Investment Practices**

64.     The Debtor in Possession also seeks a waiver of the deposit guidelines set forth in section 345(b) to the extent necessary to allow the Debtor in Possession to maintain its Bank Accounts and Investment Accounts.  Section 345 of the Bankruptcy Code authorizes a debtor to invest cash and money in a manner that will "yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a).  Section 345(b) of the Bankruptcy Code provides that, unless the bankruptcy court orders otherwise "for cause,"

> Except with respect to a deposit or investment that is insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States, the trustee shall require from an entity with which such money is deposited or invested11 U.S.C. §§ 345(b).
>     (1) a bond--
>             (A) in favor of the United States;
>             (B) secured by the undertaking of a corporate surety approved by the United States trustee for the district in which the case is pending; and
>             (C) conditioned on--
>             (i) a proper accounting for all money so deposited or invested and for any return on such money;
>             (ii) prompt repayment of such money and return; and
>             (iii) faithful performance of duties as a depository; or
>     (2) the deposit of securities of the kind specified in section 9303 of title 31.

11 U.S.C. § 345(b).

65.     Section 345 expressly provides that the Court may modify a debtor's investment requirements for "cause."  The Debtor in Possession submits that cause exists for allowing it to invest its excess cash in accordance with its existing investment policies, without meeting the strict bond requirements of section 345(b).

66.     The Debtor in Possession submits that its practices conform to the intent of section 345(b) to protect and maximize the value for its estate.  First, the Merrill Lynch Investment Accounts are invested in U.S. Treasuries.  As noted, U.S. Treasuries are backed by the full faith and credit of the United States government.  Thus, the Merrill Lynch investment accounts fall under the opening exception stated in Bankruptcy Section 345(b).

67.     As to the remaining Investment Accounts, the Debtor in Possession believes that its existing investment procedures are designed to protect the principal invested while maximizing liquidity and, therefore, believes that sufficient cause exists to waive the investment requirements of section 345(b) to allow the Debtor in Possession to continue its existing investment procedures. Cause further exists because the Debtor in Possession has an obligation under 28 U.S.C. § 959(b) to comply with the requirements of California's Uniform Prudent Management of Institutional Funds Act ("UPMIFA").  *See* Cal. Prob. Code Section 18500 et seq.  28 U.S.C. § 959(b) provides that "a trustee, receiver or manager appointed in any case pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof."  28 U.S.C. § 959(b).  Under the UPMIFA, each person responsible for managing and investing an institutional fund shall manage and invest the fund in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances.  *See* Cal. Prob. Code Section 18503(b).

68.     In *In re Diocese of Buffalo, N.Y.*, 621 B.R. 91 (Bankr. W.D.N.Y. 2020), the bankruptcy court held that waiver of section 345(b) was appropriate because the investment accounts held by the debtor in an affiliated pooled investment account made available to parishes

and other dioceses complied with New York's Prudent Management of Institutional Funds Act, which is similar to the UPMIFA. The court determined that cause existed to waive section 345(b)'s bonding requirement because, among other things, the pooling fund was professionally managed, employed strategies to assure both safety and a reasonable level of income, and that collateralization of the debtor's accounts would entail unnecessary costs and administrative burdens.

69.      Here, the Debtor in Possession maintains its Investment Accounts invested in reasonably secure investments of treasury bills and a diversified mix of fixed income and equities mutual funds. Approximately 73% of the Investment Account funds are held in short term treasury bills excluded from section 345(b) as noted above. The remaining 27% of the Investment Account funds are held in established diversified mutual funds. These Investment Accounts are monitored and approved by the RCBS's Finance Council and the Investment Committee, which selected these accounts as diversified and generally safe. Because the Investment Accounts collectively hold approximately $69.8 million, which funds are not needed by the RCBS on a daily basis, the RCBS is abiding by the UPMIFA by investing such funds with a measured approach to make a reasonable return while acting as a prudent investor.

70.      It would take a significant amount of estate resources to liquidate such funds and place them with a banking institution that would provide a bond for such accounts. Requiring the Debtor in Possession to open multiple accounts at different banks so that the deposits in each such bank would be insured by the FDIC would be unnecessarily burdensome and would lead to the same delays and disruption of the Debtor in Possession's operations that the Motion seeks to avoid. Further, requiring strict compliance would strain the Debtor in Possession's resources. Moreover, divesting these accounts in favor of a US Trustee approved bank account that pays a modest interest rate would not serve the Debtor in Possession's goals to maximize recoveries for survivors of Abuse. For example, the Merrill Lynch Investment Accounts are invested in the short term treasuries and earns about 4.5% interest a year. If the Debtor in Possession were required to liquidate the investments and place the funds in numerous Bank Accounts, the estate would be missing out on earning approximately $1 million a year in interest on these funds (assuming a 2.52% interest rate in DIP accounts). Significantly, these burdens and losses would come at little value to the estate.

The Investment Accounts holdings of treasury bills and a diversified mix of mutual funds poses little to no practical risk to the estate.

71. Courts have routinely granted requests to approve the continued use of deposit guidelines that do not comply strictly with section 345. This is especially the case when, as here, the manner of the proposed investments is safe and prudent. *See, e.g.*, *In re Service Merchandise, Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (enumerating factors to be considered in waiving requirements of section 345, including size of business and safety of debtor's proposed investments). In *In re King Mountain Tobacco Co., Inc.*, 623 B.R. 323, 332 (Bankr. E.D. Wash. 2020), the bankruptcy court held that the debtor was not required to divest its investment accounts because the "totality of the circumstances presented" established cause for waiver of section 345(b). Namely, the debtor showed that its investments were safe and that divestment would harm the estate more than it would help increase safety.

72. Indeed, Congress recognized that the requirements of section 345(b) may not be appropriate for *every* debtor regardless of size or sophistication:

> Section 345 of the Code governs investments of the funds of bankruptcy estates. The purpose is to make sure that the funds of a bankrupt that are obligated to creditors **are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankrupt estate**. Under current law, all investments are required to be FDIC insured, collateralized or bonded. While this requirement is wise in the case of a smaller debtor with limited funds that cannot afford a risky investment to be lost, it can work to needlessly handcuff larger, more sophisticated debtors. *** This section would amend the Code to allow the courts to approve investments other than those permitted by section 345(b) for just cause,*** thereby overruling *In re Columbia Gas Systems, Inc.*, 1994 WL 463514 [33 F.3d 294] (3d Cir. Del. [1994]).

*In re King Mountain Tobacco Co., Inc.*, 623 B.R. at 330-31 (citing H.R. Rep. No. 103-835, at 46-47 (1994)) (boldfaced, italicized emphasis in original; boldfaced emphasis added).

73. Here, because the Debtor in Possession's investments are prudent, reasonably safe, and unlikely to lose value, the Court should allow the Debtor in Possession to maintain its Investment Accounts. The Debtor in Possession submits that given the totality of the circumstances, its request is reasonable and cause exists for the Court to relieve the Debtor in Possession from compliance with the requirements of Bankruptcy Code section 345(b). For the foregoing reasons,

the Debtor in Possession believes that granting the relief requested herein is appropriate and in the best interests of its estate.

## VI.

### NOTICE

74.    Notice of the Motion has been provided to the 20 largest unsecured creditors, the secured creditors if any, the Cash Management Banks, the Office of the United States Trustee, the Internal Revenue Service, corresponding state agencies, as well as other governmental agencies, to the extent required by the Bankruptcy Rules and the Bankruptcy Local Rules, and those persons who have formally appeared and requested service in this case pursuant to Bankruptcy Rule 2002. Given the nature of the relief requested, the Debtor in Possession submits that no further notice of the Motion is necessary.

## VII.

### WAIVER OF BANKRUPTCY RULE 6004(h)

75.    To the extent the fourteen day stay of Bankruptcy Rule 6004(h) may be construed to apply to the subject matter of the Motion, the Debtor in Possession requests that such stay be waived.

## VIII.

### CONCLUSION

76.    Just as the financial reorganization of commercial debtors depends upon their business relationships continuing unimpeded by those reorganizations, it is equally critical to the Debtor in Possession that its reorganization case be transparent to the tens of thousands of men and women who daily seek services and solace from the RCBS and from the Parishes, schools, other Non-Debtor Catholic Entities, and charities the RCBS serves. Granting the Motion will help ensure that the RCBS can continue its mission.

WHEREFORE, the RCBS respectfully requests that the Court enter an Order substantially in the form attached to the Exhibit List as ***Exhibit 1*** as follows:

1.    Granting the Motion on an interim basis;

2.    Authorizing the RCBS on an interim basis to continue to use its existing Cash Management System;

3.      Authorizing the RCBS on an interim basis to maintain and use its existing Bank Accounts, accounting policies and practices, Business Forms and credit cards, and to the extent necessary to allow an orderly transition of the Bank Accounts, accounting policies and practices, Business Forms and credit cards;

4.      Waiving Local Rule 2015-2 and UST Guideline 3 on an interim basis to the extent necessary, as described in the Motion;

5.      Authorizing the RCBS on an interim basis to continue its Investment Accounts and investment practices in lieu of the investment requirements of 11 U.S.C. § 345(b);

6.      Scheduling a final hearing on the Motion; and

7.      Granting such other relief as the Court deems just and proper under the circumstances.

Dated: April 1, 2024

FELDERSTEIN FITZGERALD WILLOUGHBY
PASCUZZI & RIOS LLP

By     */s/ Paul J. Pascuzzi*
      PAUL J. PASCUZZI
      JASON E. RIOS
      THOMAS R. PHINNEY

      Proposed Attorneys for The Roman Catholic
      Bishop of Sacramento

Dated: April 1, 2024

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By     */s/ Ori Katz*
      ORI KATZ
      ALAN H. MARTIN

      Proposed Attorneys for The Roman Catholic
      Bishop of Sacramento